# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| MARTY ALLEN HAMP, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 1:24-cv-355 |
| v. | ) | |
| | ) | Judge Atchley |
| | ) | |
| BRADLEY COUNTY, TENNESSEE and | ) | Magistrate Judge Dumitru |
| CITY OF CLEVELAND, TENNESSEE | ) | |
| | ) | |
| *Defendants*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant City of Cleveland, Tennessee's (the "City") Motion for Summary Judgment [Doc. 24] and Defendant Bradley County, Tennessee's (the "County") Motion for Summary Judgment [Doc. 27]. For the reasons explained below, the Motions [Docs. 24, 27] will be **GRANTED**.

### I.    FACTUAL BACKGROUND

At approximately 8:45 p.m. on October 26, 2023, Austin Roderick and Scylar Allred of the Cleveland Police Department were dispatched to a non-emergency call regarding an individual walking his dog who was trying to get home but stumbled, fell, and was lying in the roadway. [Doc. 1-1 at ¶¶ 21–23]. Upon arriving at the scene at approximately 8:53 p.m., Officer Roderick identified the man as Marty Hamp, Sr. ("Mr. Hamp") due to his previous encounters with him. [*Id.* at ¶¶ 24–25].

Officer Roderick observed Mr. Hamp lying in the roadway surrounded by several citizens.

[Bodycam at 00:01].[1] Mr. Hamp attempted to stand, but Officer Roderick instructed him to remain seated on the ground. [*Id.* at 00:09]. Mr. Hamp stated that he was trying to get home and provided his address. [*Id.* at 00:25]. Officer Roderick again advised him to remain seated for his safety. [*Id.* at 00:45]. A bystander informed Officer Roderick that Mr. Hamp had "fell a couple times" and "hit his head about three times pretty good." [*Id.* at 01:15].

After spending several minutes at the scene, including obtaining a treat for Mr. Hamp's dog, Officer Roderick assisted Mr. Hamp to his feet and escorted him to his patrol vehicle while holding his right arm. [*Id.* at 01:20–04:30]. Mr. Hamp then leaned against Roderick's patrol vehicle while standing and told Officer Roderick he did not have any weapons, "dope or anything like that." [*Id.* at 04:40]. Roderick asked if Mr. Hamp had a knife, and Mr. Hamp responded, "no, I don't carry stuff like that." [*Id.* at 05:00]. During the entire encounter, Officer Roderick's body-cam footage depicts Mr. Hamp exhibiting slurred speech and difficulty maintaining balance, signs consistent with intoxication. [*Id.* at 1:20–06:25]. Officer Roderick then placed Mr. Hamp under arrest for public intoxication. [*Id.* at 05:30]. During and after his arrest, Mr. Hamp repeatedly expressed concern about his dog and inquired whether someone could take the animal to his nearby residence. [*Id.* at 1:20–06:25].

While awaiting animal control to pick up Mr. Hamp's dog, Officer Roderick spoke with the bystanders who had remained with the dog and advised them that the officers were handling the situation. [*Id.* at 08:20]. He then returned to his patrol vehicle, where he and Officer Allred began preparing an incident report. [*Id.* at 09:11]. Mr. Hamp again asked about his dog and stated he was about a half-a-block from home. [*Id.* at 09:15]. Officer Roderick replied to Mr. Hamp, "you

_____

[1] The City has offered as evidence the recording of Officer Austin Roderick's bodycam footage on the night of October 26, 2023. [*See* Doc. 26]. For convenience, the Court will refer to the recording as "Bodycam."

drank too much tonight, man." [*Id.* at 09:30]. At approximately 9:13 p.m., Officers Roderick and Allred departed from the scene with Mr. Hamp en route to the Bradley County Jail. [*Id.* at 19:00]. During the drive, Officer Roderick and Mr. Hamp conversed, and at one point, Officer Roderick told Mr. Hamp that he "just had to go sleep it off, Marty." [*Id.* at 20:30]. In addition, while discussing the incident report with Officer Allred, Officer Roderick noted that Mr. Hamp had blood on him from falls he attributed to intoxication, exhibited slurred speech, and emitted an odor of alcohol. [*Id.* at 21:30].

The officers arrived at the Bradley County Jail intake facility at approximately 9:20 p.m. [*Id.* at 26:10]. Mr. Hamp remained in the patrol vehicle for several minutes and exited at approximately 9:29 p.m. [*Id.* at 35:15]. As he exited, a corrections officer asked Officer Roderick, "what happened to his head." [*Id.* at 35:20]. Officer Roderick responded, "he fell, he's drunk." [*Id.*]. He also told the corrections officer that "[Mr. Hamp] might not be able to stand." [*Id.* at 35:28]. Mr. Hamp then proceeded slowly toward the jail entrance to begin the booking process with assistance from a corrections officer. [*Id.* at 35:30]. Shortly thereafter, Mr. Hamp fell to his knees and was helped back up to his feet by the corrections officer and Officer Allred. [*Id.* at 36:20]. As Mr. Hamp fell to his knees, the bodycam footage appears to show a small wound and blood on the back of his head. [*Id.* at 36:11]. At approximately 9:31 p.m., Mr. Hamp was escorted into the jail with the assistance of two corrections officers. [*Id.* at 37:30–37:50].

Later that evening, Mr. Hamp was evaluated by Bradley County Jail nurse Amy Roberts ("Nurse Roberts") in the holding cell. [Doc. 28-2]. During her assessment, Nurse Roberts observed a "superficial" wound measuring approximately 0.5 x 0.5 x 0.1 centimeters near the back of Mr. Hamp's head but that it was not bleeding at the time of the examination and had already clotted. [*Id.* at 18:6–19:23]. Nurse Roberts testified that she cleaned and covered the wound. [*Id.* at 18:11–

3

15]. She further testified that during her examination, Mr. Hamp was conversational, laughed, and spoke about his dog. [*Id.* at 20:13–25]. Mr. Hamp also denied any head, neck, or back pain. [*Id.* at 22:5–13]. Based on her assessment, Nurse Roberts did not believe that Mr. Hamp required emergency medical treatment. [*Id.* at 23:15–20].

At approximately 10:00 p.m., less than three minutes after Nurse Roberts completed her medical evaluation and left the holding cell, Mr. Hamp arose from the bench he was laying on, stumbled to the window, fell backwards, and hit his head on the concrete floor. [Doc. 28-2; Doc. 1-1 at ¶ 31]. Corrections officers immediately called for EMTs, and Mr. Hamp was transported by ambulance to the local hospital where he arrived at approximately 1:00 a.m. on October 27, 2023, unresponsive and medically unstable. [Doc. 1-1 at ¶¶ 33–35]. The autopsy report indicated the cause of death to be blunt force trauma to the right side of Mr. Allen's head. [*Id.* at ¶¶ 36–37].

The medical examiner who performed the autopsy, Dr. Darinka Mileusnic-Polchan, testified that Mr. Hamp's initial head injury was a "minor laceration" that did not necessitate immediate emergency room care. [Doc. 24-2 at 42:8–44:15]. Dr. Mileusnic-Polchan further testified that, based on the length and depth of the initial laceration, it would not have impacted Mr. Hamp's brain. [*Id.* at 44:6–45:3]. Ultimately, Dr. Mileusnic-Polchan identified the cause of death to be "craniocerebral injuries due to blunt force head trauma due to backward fall." [Doc. 28-3 at 16:5–13].

On October 16, 2024, Plaintiff Marty Allen Hamp, Mr. Hamp's son, filed a Complaint in the Circuit Court for Bradley County, Tennessee against Defendants asserting various federal constitutional and state law violations. [Doc. 1-1]. This matter was subsequently removed to this Court by Defendants on November 5, 2024. [Doc. 1]. Now, both Defendants have moved for summary judgment in their favor. [Docs. 24, 27]. Plaintiff has responded to each motion [Docs.

4

30, 31], and Defendants have replied [Docs. 32, 33]. The Motions are now ripe for the Court's review.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*,

578 F.3d 351, 374 (6th Cir. 2009) (citations omitted). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

There is an added wrinkle to the summary judgment standard when video evidence is involved. "To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). On the other hand, if the "facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id.* (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

## III. ANALYSIS

### a. The City's Motion for Summary Judgment [Doc. 24]

The City moves for entry of summary judgment on all of Plaintiff's claims. [Doc. 24]. Specifically, Plaintiff has brought the following four causes of action against the City: (1) a deliberate indifference claim pursuant to the Eighth and Fourteenth Amendments; (2) a loss of parent-child relationship claim under the Fourteenth Amendment; (3) a state-law claim for violation of the Tennessee Governmental Tort Liability Act, T.C.A. § 29-20-101, *et. seq.*

("TGTLA"); and (4) a state-law claim for violation of the Tennessee Open Records Act, T.C.A. § 10-7-501, *et seq.* The Court will analyze each claim in turn.

### i. Deliberate Indifference Claim

Based on the allegations in the Complaint, Plaintiff appears to be relying on various theories of liability under his deliberate indifference claim. Plaintiff alleges that Defendants "neglected Mr. Hamp's medical needs and failed to provide adequate medical care" in violation of the Eighth and Fourteenth Amendments. [Doc. 1-1 at ¶¶ 56–57]. Plaintiff also alleges that Defendants "were deliberately indifferent to Mr. Hamp's serious medical needs and failed to intervene despite their duty to do so." [*Id.* at ¶¶ 64–65]. Therefore, the Court will construe Plaintiff's Complaint as asserting both a failure to provide adequate medical care claim and a failure to intervene claim.

As to the failure to provide adequate medical care claim, pretrial detainees enjoy a "right to adequate medical care" under the Fourteenth Amendment. *Batton v. Sandusky Cnty.*, No. 23-3168, 2024 U.S. App. LEXIS 8330, at *7 (6th Cir. 2024) (internal citation omitted). "A government official violates this right by acting with 'deliberate indifference' to the detainee's 'serious medical needs.'" *Id.* The deliberate indifference inquiry contains both an objective and subjective component. *Id.* To prevail on a deliberate indifference claim, "a plaintiff must show (1) that [the detainee] had a sufficiently serious medical need and (2) that each defendant acted deliberately (not accidentally), and also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Kuhl v. Igo*, No. 21-57-DLB-EBA, 2025 U.S. Dist. LEXIS 24046, at *8 (E.D. Ky. Feb. 11, 2025) (citing *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305, 317 (6th Cir. 2023)). "Stated differently, a pretrial detainee must have a serious medical need, and the defendant must act, whether through intentional action or omission,

recklessly in response to the need and the risk it presented to the detainee." *Id.* (internal quotations and citation omitted).

Here, neither prong of the deliberate indifference test is satisfied. The first prong, the objective component, asks whether Mr. Hamp suffered from a sufficiently serious medical need. "'A sufficiently serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* at *9 (quoting *Yarbrough v. Henderson Cnty. Tenn.*, No. 23-5117, 2024 U.S. App. LEXIS 1549, at *10 (6th Cir. 2024)). Plaintiff argues that Mr. Hamp's level of intoxication during his encounter with the City officers evidenced a life-threatening condition. [Doc. 31 at 4–7]. However, "intoxication in and of itself, is not a sufficiently serious medical need." *Id.* at *9–10 (collecting cases). Rather, courts typically only find an intoxicated detainee suffered from a sufficiently serious medical need where the nature of the detainee's intoxication was "'extreme.'" *Id.* at *11 (quoting *Hinneburg v. Miron*, 676 F.App'x 483, 486 (6th Cir. 2017)).

It is clear from the record that Mr. Hamp was not displaying any symptoms of intoxication akin to what other courts have found to be "extreme." *See Preyor v. City of Ferndale*, 248 Fed. Appx. 636 642 (6th Cir. 2007) (inmate was seen lying on the cell floor vomiting and experiencing diarrhea); *Bertl v. City of Westland*, No. 07-2547, 2009 U.S. App. LEXIS 2086, at *16 (6th Cir. 2009) (inmate was "lying face down on the floor of his cell, almost comatose, unresponsive and having seizure-like spasms"); *Burwell v. City of Lansing, Mich.*, 7 F.4th 456, 464 (6th Cir. 2021) (detainee was "bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly."). The bodycam footage depicts Mr. Hamp exhibiting slurred speech and difficulty maintaining balance, symptoms that are not "atypical . . . from the multitude of drug and alcohol abusers the

jail admits everyday." [*See* Bodycam at 1:20–06:25]; *Kuhl*, 2025 U.S. Dist. LEXIS 24046, at *12 (internal citation omitted).

Plaintiff argues that Mr. Hamp's "head trauma should have signaled to Defendant City officers that Mr. Hamp may be more than 'just drunk' and in need for further examination." [Doc. 31 at 5–6]. The undisputed evidence, however, does not support that contention. Nothing in the bodycam footage or other evidence suggests Mr. Hamp exhibited symptoms that would have made the need for immediate medical attention obvious to a layperson at the time of his arrest. This conclusion is reinforced by what occurred shortly thereafter when Mr. Hamp was evaluated by Nurse Roberts at the Bradley County Jail. After examining his head, Nurse Roberts concluded that Mr. Hamp's head injury was superficial and did not require emergency medical care. [Doc. 28-2 at 23:15–20]. The Sixth Circuit has indicated that "a medical need was not obvious, and hence not objectively serious, when it was not obvious to trained medical personnel." *Hodges v. Abram*, 138 F.4th 980, 988 (6th Cir. 2025) (citing *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009) (intoxicated detainee did not have a sufficient serious medical condition when EMTs at the scene, and a jail nurse, did not believe medical attention was necessary). Although Mr. Hamp was evaluated after the City officers relinquished custody of him, if a trained medical professional, upon examining Mr. Hamp, did not believe he required immediate medical attention, it follows that Officers Roderick and Allred—who are not medical professionals—cannot be faulted for failing to recognize an obvious need for emergency care based on the circumstances. *See id.* at 989.

Plaintiff avers that a genuine dispute of material fact exists because Dr. Mileusnic-Polchan could not determine whether Mr. Hamp's head injury occurred before or after his arrest. [Doc. 31 at 7]. That argument misses the mark. The relevant question is not when the injury occurred, but whether Mr. Hamp's condition during the time he was in the custody of the City was "so obvious

that even a lay person would easily recognize the necessity for a doctor's attention." *Kuhl*, 2025 U.S. Dist. LEXIS 24046, at \*9. The undisputed evidence in the record shows it did not.

Both Nurse Roberts and Dr. Mileusnic-Polchan testified that Mr. Hamp's initial head injury was minor and did not require emergency medical treatment. [*See* Doc. 28-2 at 23:15–20; Doc. 24-2 at 42:8–44:15, 44:6–45:3]. Indeed, Dr. Mileusnic-Polchan specifically explained that Mr. Hamp's initial head injury caused no internal brain damage. [Doc. 24-2 at 44:6–45:3]. Even assuming Mr. Hamp suffered some form of serious head injury before his arrest, he did not exhibit symptoms beyond normal conditions of intoxication that would have made the need for immediate medical care obvious to Officers Roderick or Allred. The Constitution does not require police officers—who are not trained medical professionals—to abandon an otherwise lawful arrest based on the mere possibility that an intoxicated individual may be suffering from a nonobvious medical condition. Therefore, regardless of when the injury occurred, the record is devoid of evidence that Mr. Hamp was suffering from a sufficiently obvious medical condition.

As to the second prong, the subjective component, Plaintiff has not identified any evidence in the record demonstrating that Officers Roderick or Allred acted deliberately or recklessly in the face of an unjustifiably high risk of harm. *Kuhl*, 2025 U.S. Dist. LEXIS 24046, at \*8. When the officers arrived, they encountered an individual who was plainly intoxicated and exhibiting symptoms consistent with intoxication. [Bodycam at 01:20–06:25]. Although bystanders informed the officers that Mr. Hamp had fallen and struck his head, the bodycam footage shows that he was responsive, able to communicate, and capable of standing and walking with assistance to Officer Roderick's patrol vehicle. [*Id.*]. Nothing about his condition would have made the need for immediate medical attention obvious to a reasonable lay person. *See Meier v. Cnty. of Presque Isle*, 376 F. App'x 524, 528–29 (6th Cir. 2010) (detainee's intoxication alone did not put officers

on notice that the detainee, who suffered a head injury, needed medical attention, where the detainee cooperated and communicated with officers). To the contrary, medical professionals later described Mr. Hamp's head injury as "superficial" and "minor." [*See* Doc. 28-2 at 20:3–12; Doc. 24-2 at 42:8–44:15]. At most, the officers may have been negligent in failing to further evaluate Mr. Hamp's head injury; however, negligence is not enough to establish a constitutional violation.[2]

Accordingly, the Court finds that the undisputed evidence does not establish that Officers Roderick and Allred violated Mr. Hamp's civil rights under a failure to provide adequate medical care claim.

Plaintiff's failure to intervene claim fares no better. To begin, Plaintiff cannot succeed on a failure to intervene claim when there is no underlying constitutional deprivation. *See Bonner-Turner v. City of Ecorse*, 627 Fed.Appx. 400, 413 (6th Cir. 2015). However, even if there was, the City did not have the "opportunity and the means" to intervene once Mr. Hamp left the City's custody and entered the Bradley County Jail. *See Turner v. Scott*, 119, F3d 425, 429 (6th Cir. 1997). The evidence in the record shows that Officers Roderick and Allred arrested Mr. Hamp and took him to the Bradley County Jail to be booked and processed. Once there, he was promptly seen and evaluated by Nurse Roberts. The Court fails to see what more the City officers should have done in light of Mr. Hamp's condition. Absent any indication that Mr. Hamp required immediate medical treatment, the City officers acted reasonably in transporting him to the Bradley County

---

[2] Plaintiff also argues the City officers acted with deliberate indifference when the County officials had to ask what happened with Mr. Hamp's head rather than relaying that information initially. [Doc. 31 at 6–7]. However, a failure to preemptively deliver information about Mr. Hamp's head does not rise to the level of recklessness. *See Spears*, 589 F.3d at 255–56 ("Further, Officer Ruth's disputed failure to tell the EMTs and jail officers that McCargo admitted to smoking crack cocaine was at worst negligent, and does not rise to the level of a constitutional violation."). In any event, Nurse Roberts fully evaluated Mr. Hamp's head despite the information the City officers may not have disclosed. [Doc. 24-1 at 18:6–19:8].

Jail, where he would be evaluated by medical personnel. *See Border v. Trumball Cnty. Bd. Of Comm'rs*, 414 F.App'x 831, 837 (6th Cir. 2011) ("Thus, a pretrial detainee's generalized state of intoxication, without more, is insufficient to establish a serious medical need or an officer's deliberate indifference to a substantial risk of serious harm to a detainee."). Moreover, even if the County officials later violated Mr. Hamp's rights, Officers Roderick and Allred had relinquished custody of Mr. Hamp and had no further constitutional duty to intervene. Therefore, Plaintiff's failure to intervene claim fails.

Finally, even assuming for the sake of argument that Mr. Hamp's civil rights were violated under either a failure to provide adequate medical care or failure to intervene claim, Plaintiff has not produced any facts demonstrating that his constitutional rights were violated because of an unconstitutional City policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 708 (1978) (Powell, J., concurring) (explaining a municipality can only be held– liable for harms that result from a constitutional violation when that underlying violation resulted from "implementation of its official policies or established customs"). And the City cannot be held liable merely for the unconstitutional acts of its officers. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[O]ur precedents establish . . . that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."); *Monell*, 436 U.S. at 691 (finding that liability under § 1983 may not be imposed merely because a defendant "employs a tortfeasor").

Here, Plaintiff alleges that the City's policies "were improperly carried out due to inadequate training and supervision" and that the City has "a custom of tolerance of and/or acquiescence of federal civil and constitutional violations." [Doc. 1-1 at ¶ 1]. To succeed under a failure to train theory, Plaintiff must prove the following: "(1) the training or supervision was

12

inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Plaintiff has not produced any prior instances of unconstitutional conduct relating to the City's failure to provide adequate care, nor has he shown any particular deficient training program. *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) ("A failure-to-train claim . . . requires a showing of prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of abuse and was clearly on notice that training in this particular area was deficient and likely to cause injury." (internal citations omitted)). In fact, Plaintiff offers very little, if anything, in response to the City's *Monell* argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Plaintiff's conclusory allegations in his Complaint cannot form the basis for a failure to train claim against the City. *See Biggin v. Ohio*, No. 3:17-cv-2193, 2019 U.S. Dist. LEXIS 128843, at \*16 (N.D. Ohio Aug. 1, 2019) ("Plaintiff's conclusory allegations, utterly devoid as they are, of any factual underpinning, simply cannot sustain a policy/practice failure to train claim.").

Accordingly, the undisputed evidence in the record demonstrates that the City is entitled to summary judgment on Plaintiff's deliberate indifference claim.

### ii. Loss of Parent-Child Relationship Claim

To succeed on a due process right of familial association claim in the Sixth Circuit, a Plaintiff must prove that a government official, at a minimum, "acted with a culpable state of mind directed at the plaintiff's family relationships or a decision traditionally associated within the ambit of the family." *Chambers v. Sanders*, 63 F.4th 1092, 1100 (6th Cir. 2023). This means that "many

<span>13</span>

state actions with collateral effects are not constitutional violations." *Id.*

Here, Plaintiff has failed to produce any evidence that the City directed any of its conduct to Plaintiff's family relationship. And he has similarly failed to address the City's argument on this issue. The Court, therefore, cannot find that Plaintiff has asserted a viable familial association claim in the light of the record before it.

Accordingly, the City is entitled to summary judgment on Plaintiff's loss of parent-child relationship claim.

### iii. Plaintiff's Remaining State Law Claims

Plaintiff has asserted two state law claims premised on violations of the TGTLA and the Tennessee Open Records Act. [Doc. 1-1 at ¶¶ 70–98]. District courts "may decline to exercise supplemental jurisdiction" over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(2). The Court can also decline to exercise supplemental jurisdiction "in exceptional circumstances [where] there are compelling reasons for declining jurisdiction." *Id.* § 1367(c)(4).

The TGTLA provides that "[t]he circuit courts [of Tennessee] have exclusive jurisdiction over any action brought under this chapter." T.C.A. § 29-20-307. As a result of this "exclusive jurisdiction" provision, federal district courts routinely refuse to exercise supplemental jurisdiction over state-law claims brought under the TGTLA. *See, e.g.*, *Durham v. Estate of Losleben by and through Tatum*, No. 16-1042, 2017 WL 888357, at \*5 (W.D. Tenn. Mar. 6, 2017) (collecting cases). In fact, the Sixth Circuit has held "the Tennessee legislature expressed a clear preference that TGTLA claims be handled by its own state courts. This unequivocal preference of the Tennessee legislature is an exceptional circumstance for declining jurisdiction." *Gregory v. Shelby Cnty., Tenn.*, 220 F.3d 433, 446 (6th Cir. 2000), *abrogated on other grounds by Buckhannon Bd.*

*& Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598 (2001). Because Tennessee's legislature clearly prefers that TGTLA cases are handled by their state courts, the Court declines to exercise jurisdiction over Plaintiff's TGTLA claim.

Similarly, the Tennessee Open Records Act provides that petitions challenging the denial of an open records request "shall be filed in the chancery court or circuit court of that county having equity jurisdiction." T.C.A. § 10-7-503(b). Courts in this district have declined to exercise jurisdiction over claims arising under the Tennessee Open Records act due to the Tennessee legislature's clear preference that these claims be handled by their state courts. *See Kallenberg v. Knox County Bd. Of Educ.*, No. 3:06-CV-371, 2009 U.S. Dist. LEXIS 67303, at *10-11 (E.D. Tenn. June 29, 2009) ("As for the Tennessee Open Records Act, the Act provides sole jurisdiction to resolve disputes over such requests to state courts. . . .[t]hus, to the extent the plaintiff also relies upon requests propounded under the Tennessee Open Records Act, the undersigned must leave the determination of whether the defendants have violated such requests to the appropriate state court.").

Because the Court has found exceptional circumstances and has dismissed Plaintiffs' federal claims against the City and, as explained further below, will similarly dismiss the federal claims against the County, it will decline to exercise supplemental jurisdiction over the remaining state law claims.

b. *The County's Motion for Summary Judgment [Doc. 27]*

Plaintiff asserts the same three causes of action against the County except the state law claim for a violation of the Tennessee Open Records Act. [Doc. 1-1 at ¶¶ 52–98]. Just as before, the Court will analyze each claim in turn.

### i. Deliberate Indifference Claim

Similar to his claims against the City, Plaintiff asserts various theories of liability as to his deliberate indifference claim. In addition to the failure to provide adequate medical care and failure to intervene claims, Plaintiff also alleges that the County, while it had custody of Mr. Hamp, "failed to take reasonable measures to avoid risk of serious harm." [Doc. 1-1 at ¶ 58]. The Court, therefore, construes Plaintiff's claims against the County to also include a failure to prevent harm claim under the Fourteenth Amendment.

For many of the same reasons explained above, Plaintiff's failure to provide adequate medical care and failure to intervene claims fail as a matter of law because Mr. Hamp was not suffering from a sufficiently obvious medical condition. *See Kuhl*, 2025 U.S. Dist. LEXIS 24046, at *9. Unlike the City officers who relinquished custody of Mr. Hamp when he entered the jail, the County officers had the benefit of a medical professional's opinion when Nurse Roberts evaluated and cleared Mr. Hamp. [*See* Doc. 28-2 at 23:15–20]. Again, "[e]ven when a detainee may be exhibiting signs of extreme intoxication, if medical personnel previously observed the detainee, and did not find medical attention necessary, then a plaintiff is unlikely to establish that such a need was obvious to a lay person." *Kuhl*, 2025 U.S. Dist. LEXIS 24046, at *11 (citing *Spears*, 589 F.3d at 254).

Plaintiff's cited cases in support of his argument are distinguishable from this case. For instance, in *Burwell*, the detainee showed clear signs of medical distress, including "[being] bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly." 7 F.4th at 464. The detainee in *Burwell* "ultimately fell to the ground where he [laid] motionless until officers attempted to revive him hours later." *Id.* In *Helphenstine*, the detainee experienced diarrhea,

vomiting, sweating, and was observed in a "near-lifeless state after days of illness." 60 F.4th at 320. There are no facts in this case that rise to the level of the extreme symptoms exhibited by the detainees in *Burwell* and *Helphenstine*. Indeed, Nurse Roberts testified that during her examination of Mr. Hamp, he was conversational, laughed, and spoke about his dog. [Doc. 28-2 at 20:13–25]. While it may be true that medical staff would not have left Mr. Hamp alone if they knew he could not stand on his own, Plaintiff cannot point to any case law showing how that failure rises to the level of recklessness as a matter of law.

In short, the evidence in the record shows that both medical personnel in this case, the jail nurse and medical examiner, agree that Mr. Hamp's initial head injury did not require immediate medical attention. [*See* Doc. 28-2 at 23:15–20; Doc. 24-2 at 42:8–44:15, 44:6–45:3]. The County, therefore, cannot be held liable under Plaintiff's failure to provide adequate medical care and failure to intervene claims as a matter of law.[3]

---

[3] Plaintiff's deliberate indifference claim likely fails for yet another reason. Even assuming for the sake of argument that Plaintiff has established that Mr. Hamp suffered from an obvious medical condition, his claims are likely barred due to Mr. Hamps' failure to opt out of a class action litigation regarding the alleged denial of Bradley County Jail inmates' rights to medical care. *See Eden, et al. v. Bradley County, Tennessee*, Case No. 1:18-cv-217. In the Agreed Order Approving Class Action Settlement in *Eden*, the class of eligible members is defined as:

> **The Damages Class: all persons who, during the Damages Class Period: (a) were inmates at the Jail (i.e., were under arrest and had been or were being transported to the Jail in the custody of the BCSO (but not any other law enforcement agency)); and (b) during their period of confinement, suffered from an obvious or diagnosed medical condition (or conditions) and either: (i) received no medical care for said condition (or conditions); or (ii) despite any medical attention received, suffered a worsening of said condition (or conditions) and/or unnecessary pain, suffering, or discomfort.**

[*Id.* at Doc. 119 pp. 7–8]. Membership in the damages class included those incarcerated in Bradley County Jail between September 18, 2017, and November 29, 2023. [*Id.* at Doc. 107-1 p. 13]. Mr. Hamp was incarcerated on October 26, 2023, and did not opt out of the class action within the class membership deadline. [Doc. 28 at 21]. The Court does not see how the events in this instant litigation are materially different from the types of claims encompassed in the *Eden* Class Action

17

As to Plaintiff's failure to prevent harm claim, "[a] detainee may claim a Fourteenth Amendment violation based on a state actor's 'failure to prevent harm' in the conditions of confinement—that is, the failure to take reasonable measures for the safety of the detainee." *Schack v. City of Taylor*, 177 Fed. App'x. 469, 471 (6th Cir. 2006) (internal citation omitted). "Such a claim requires a showing that the state actor knew that there was an 'excessive risk' to the detainee's health or safety," and acted with "'deliberate indifference'" to that risk." *Id.* (internal citation omitted). Here, Plaintiff argues that "jail and medical staff acted with deliberate indifference by ignoring Mr. Hamp's clear symptoms of severe intoxication and leaving him unmonitored in the 'drunk tank' where he could fall on a concrete floor." [Doc. 30 at 10]. The Court disagrees.

The Sixth Circuit's holding in *Schack* is instructive. In *Schack*, the detainee, similar to Mr. Hamp, was arrested for disorderly intoxication. 177 Fed. App'x. at 470. As the correction officers led the detainee into the booking room, he lost his balance twice and had to be assisted. *Id.* Due to his level of intoxication and belligerence, the officers decided to place the detainee in a detoxification cell until he sobered up. *Id.* Shortly after being placed in the cell, the detainee stood up from the cell's bench, fell over, and hit his head on a concrete wall, causing a fatal injury. *Id.* The defendants argued that because the detainee was "so intoxicated that he could not stand or walk on his own," he should not have been left in his cell unattended. *Id.* at 472. However, the Sixth Circuit disagreed, explaining:

---

Settlement. Plaintiff argues that the claims in *Eden* are unlike his because they involve allegations where inmates were refused necessary medical care, whereas his claims are premised on jail personnel refusing to convey necessary medical information. [Doc. 30 at 13]. Plaintiff's argument is a distinction without a difference in light of the broad definition used to describe the "Damages Class." Mr. Hamp was in custody during the relevant time frame and, despite any medical attention received, he suffered a worsening condition. Therefore, even if Plaintiff's deliberate indifference claim prevailed, it would fall under the claims settled in *Eden*.

But the cadets did not leave Schack *standing* or *walking* in the detox cell; they sat Schack on a bench in the cell, and he remained sitting as they left the cell. Even assuming the cadets recognized the risk that after they left the cell Schack might try to stand and might fall, recognition of an *increased* risk of Schack falling is not equivalent to recognition of a substantial risk of serious harm. Nothing indicates that the officers actually foresaw an injury of this magnitude and maintained their course of conduct in defiance of the risk of harm.

*Id.* (emphasis in original).

The Court fails to see how the facts of Mr. Hamp's case are materially different to those in *Schack*. Similar to the detainee in *Schack*, medical personnel left Mr. Hamp sitting in his cell, where he later got up from and fell on the concrete floor. [*See* Doc. 1-1 at ¶¶ 31–32]. Nothing in the record indicates that the County officers foresaw such an "excessive risk" of injury and recklessly ignored it. *See Schlack*, 177 Fed. App'x. at 472.

Finally, Plaintiff does not offer any evidence of an unconstitutional policy or custom that would give rise to *Monell* liability even if he demonstrated that the County violated his civil rights. Conversely, the County has provided evidence that the policies and procedures in existence at the time of Mr. Hamp's injury met or exceeded the standards required by the Tennessee Corrections Institute. [*See* Doc. 28-4 at ¶ 97]. For many of the same reasons explained above, Plaintiff has failed to demonstrate how the County is liable under *Monell*.

Accordingly, the undisputed evidence in the record demonstrates that the County is entitled to summary judgment on Plaintiff's deliberate indifference claim.

### ii. Loss of Parent-Child Relationship Claim

For the same reasons that Plaintiff's familial association claim fails against the City, it likewise fails against the County. Plaintiff does not produce any evidence that the County directed any of its conduct to Plaintiff's family relationship, nor does he address it in response to the County's motion for summary judgment. *See Chambers*, 63 F.4th at 1100. The Court cannot find

19

that Plaintiff has asserted a viable familial association claim in the light of the record before it.

Accordingly, the County is entitled to summary judgment on Plaintiff's loss of parent-child relationship claim.

### iii. Plaintiff's TGTLA Claim

Plaintiff's sole remaining claim against the County arises under the TGTLA. [*See* Doc. 1-1 at ¶¶ 70–92]. Based on the reasons the Court explained above, it will decline to exercise supplemental jurisdiction over Plaintiff's TGTLA claim.

## IV. CONCLUSION

For the reasons stated above, Defendant City of Cleveland, Tennessee's Motion for Summary Judgment [Doc. 24] and Defendant Bradley County, Tennessee's Motion for Summary Judgment [Doc. 27] are **GRANTED**, and this action will be **DISMISSED**. All claims arising under 42 U.S.C. § 1983 are **DISMISSED WITH PREJUDICE**. Finally, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims, which are **DISMISSED WITHOUT PREJUDICE**.

**AN APPROPRIATE JUDGMENT WILL ENTER.**

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**